1   Law Office of Gregory S. Parvin
2   290 N. Willow Street • Wasilla, AK 99654
    P: (907) 376-2800 • F: (907) 376-2828
3   Gregory S. Parvin: gparvin@gparvinlaw.com
    Ginger Curet, Paralegal: gcuret@gparvinlaw.com

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
THIRD JUDICIAL DISTRICT AT SITKA

JOAN ERICKSON, WALT CORAM, and CREED CORAM,                    )
                                                              )
                 Plaintiff(s),                                )
                                                              )
vs.                                                           )
                                                              )   Case No. 1SI-21- 23 CI
PATRICIA A. PFIESTER individually, and dba ACP,               )
ACP, LLC, ALASKAN COFFEE POT, LLC, JOE                        )
MARKEY, JPI, LLC, JAKE MARKEY, BRUCE                          )
TENNEY, and LARRY CHEDEREWICZ,                                )
                                                              )
                 Defendant(s)                                 )

**COMPLAINT**

COMES NOW Plaintiffs, by and through counsel, and alleges as follows:

**INTRODUCTION**

This case involves a run of the mill Ponzi scheme directed at a small, primarily trusting and vulnerable community in the remote Southeast Alaska town of Port Alexander ("PA"). The leader of this scheme is Jake Markey, who solicited funds for a marijuana grow operation from the community by promising 24% up to 60% per annum on their investment with little to no risk of loss. JAKE told investors and stakeholders about his plans to grow marijuana in PA and sell it within Alaska and in his future planned Juneau dispensary, the Alaskan Coffee Pot at retail prices virtually ensuring that both he and the PA community could continue to earn their outsized returns as long as they left their money in the company. Taking a page out of Charles

COMPLAINT

Exhibit _____ 1

1    Ponzi's playbook, JAKE then solicited larger investments from new investors that he then used

2    to pay the initial investors.  As in any Ponzi scheme, once it becomes difficult to recruit new

3    investors, or fraud is somehow detected, things fall apart.

4
                              **PARTIES, JURISDICTION & VENUE**
5

6        1.      Plaintiff, Joan Erickson, ("JOAN") at all times material to the complaint, was

7    and remains a resident of Texas.

8        2.      Plaintiff, Creed Coram, ("CREED") at all times material to the complaint, was

9    and remains a resident of Alaska and is Joan Erickson's son. CREED is 25 years old with

10   virtually no prior business experience.  CREED is the assignee and holder of a $20,000

11   promissory note previously held and owned by Tom Redmond, made as a securities offering by

12
     JAKE but signed by JOE on behalf of JPI, LLC.
13

14       3.      Plaintiff, Walt Coram, ("WALT") at all times material to the complaint, was and

15   remains a resident of Texas and is Joan's husband, and CREED's father.  WALT is a

16   businessman who has founded and operates a business in the energy industry in Texas for over

17   20 years.  WALT and JOAN own a vacation home and properties in PA.

18
         4.      Defendant, Joe Markey, ("JOE") at all times material to the complaint, was and
19

20   remains a resident of the First Judicial District in Alaska and is the brother and business partner

21   of Jake Markey.  Joe Markey also identified himself with the State of Alaska Division of

22   Corporations as the sole member, manager and registered agent of JPI, LLC on its formation

23   date of February 2, 2019.

24
         5.      Defendant, Jake Markey, ("JAKE") at all times material to the complaint, was
25

26   and remains a resident of the First Judicial District in Alaska and is the brother and business

27   COMPLAINT                                              *ERICKSON, ET AL V. PFIESTER, ET AL*
                                                              CASE NO. 1SI-21-_____CI
28                                                                           Page 2 of 25

                                              Exhibit ____

partner of Joe Markey.  Joe and Jake Markey shall be referred to collectively as ("BROTHERS").

6.      Defendant, Patricia A. Pfiester, ("PEPPER") at all times material to the complaint, was and remains a resident of Port Alexander, Alaska, and identified herself with the State of Alaska Division of Corporations as the sole member, owner and registered agent of ACP, LLC.  After forming the ACP, LLC on February 2, 2019, PEPPER then operated and did business under both the names "ACP" and "ACP, LLC". PEPPER and her husband, Ken, worked for the Coram family for eight or more years in PA, becoming residents of Alaska from Texas.

7.      Defendant, ACP, LLC, ("ACP") at all times material to the complaint, was and remains a domestic limited liability company in active status with the State of Alaska Division of Corporations, operating under entity number 10099253, and identifying its primary physical place of business with the State of Alaska's Division of Corporations ("DOC") as Lot 13, Port Alexander Alaska 999836, and its mailing address, as PO Box 8148, Port Alexander, Alaska 999836.

8.      Defendant JPI, LLC, ("JPI") at all times material to this complaint, was and remains a domestic limited liability company in active status with the DOC operating under the entity number 10099255 and identifying its primary physical address as 3 Main Street, Port Alexander, Alaska 99836, and mailing address as PO Box 8001, Port Alexander, Alaska 99836.

9.      Defendant Bruce Tenney at all times material to the complaint owns two lots in PA which, at all times relevant before this petition was initiated, were sold to Jake Markey

under a contract for deed and on which the grow facility was constructed using funds borrowed from Joan and locals in PA.

10.    Defendant Alaskan Coffee Pot, LLC, at all times material to the complaint, was and remains a domestic limited liability company in active status with the State of Alaska Division of Corporations, operating under entity number 10128892, and identifying its primary physical place of business with the State of Alaska's Division of Corporations ("DOC") as 3 Main Street, Port Alexander, Alaska  99836, and mailing address as PO Box 8001, Port Alexander, Alaska 99836.

11.    Defendant Larry Chederwicz at all times material to the complaint was and remains a resident of the First Judicial District in Alaska.

12.    This court has personal jurisdiction pursuant to Alaska Statute § 09.05.010 et seq. and the requirements of due process under the state and federal constitutions, as further defined by Rule of Civil Procedure 4 and emergency orders currently in effect.

13.    This court has subject matter jurisdiction pursuant to AS § 22.10.020(a).  Venue lies in this court pursuant to AS § 22.10.030-040 and Alaska Rule of Civil Procedure 3(c) and (d).

## FACTS COMMON TO ALL COUNTS

14.    At times over the course of 2018 and 2019, the BROTHERS began meeting with various individuals for the purpose of funding and starting a marijuana grow business in the remote Southeast Alaska town of Port Alexander.  One of these individuals was Pepper Pfiester, a resident of PA and in her 80s.

COMPLAINT

*ERICKSON, ET AL V. PFIESTER, ET AL*
CASE NO. 1SI-21-_____CI
Page 4 of 25

Exhibit _____

15.     JAKE, in cooperation with JOE, came up with the idea to grow marijuana in Port Alexander to sell to third party owned dispensaries throughout Alaska as well as to his own planned retail dispensary in Juneau called the "THE ALASKAN COFFEE POT". This integrated business model will be collectively referred to herein as the "marijuana business".

16.     In December of 2018, JAKE approached CREED about working together as a start-up business to help him run the marijuana grow facility. Initially, JAKE suggested a few different positions he saw CREED in with a range of wages. Ultimately, JAKE discussed making CREED serve as the "Main Guy" and the face of the company, in charge of handling business dealings with the state, attending trade shows, delivering product and helping run the company once the company became operational. They discussed making CREED an equal partner with each of the BROTHERS and agreed that CREED would share in profits for those specific duties. JAKE and JOE offered to build the cultivation facility and grow the marijuana as they had construction and growing experience.

17.     As these conversations were occurring with CREED, the BROTHERS, primarily JAKE, solicited funds from local community members, residents, and landowners in the small town of Port Alexander for investment capital. In his pitch to prospective investors, JAKE promised to use the capital for the express purpose of starting up and developing a marijuana grow operation in their town.

18.     JAKE baited prospective investors by saying he had more than enough capital already and did not need their money. JAKE explained that he simply wanted to spread the wealth and allow PA locals to make money alongside him. For a minimum investment of $10,000, he promised prospective investors 2% monthly interest on their investment. JAKE

Exhibit ___

treated the investments like loans and did not deliver any portions of ownership. JAKE guaranteed the loans, which he said could be refunded in full, after two years of reaping annual gains of 24% interest on their capital investment in the marijuana business. JAKE also represented to investors he would make the loan interest payments and labor costs out of the revenue of the marijuana business, knowing that it would take at least four harvests, or roughly 9 months, to develop a quality product and generate income. JAKE knew there was no cash for sustaining operations during this time. JAKE omitted the material fact that he would need to recruit new investors using this same misinformation to make his interest payments on the company debt, pay for fuel, pay for growing equipment and materials, and fund ongoing labor.

19.　　PEPPER and her husband, Ken Pfiester, were approached by JAKE with a similar pitch and contributed more than $70,000 to the marijuana business. In late 2018, JAKE discovered he was not qualified at the time to be a marijuana cultivation licensee, as he had not resided and domiciled in Alaska for 12 consecutive months. Needing an Alaskan resident to hold the State license, JAKE promised PEPPER a 3% monthly return for filing as the owner of ACP. JAKE claimed to have a right to take assignment of ownership once he achieved resident status.

20.　　Sometime in 2018-2019, the BROTHERS negotiated terms with BRUCE TENNEY, the owner of Lots 12 and 13, Block Two (2), Tract B, US Survey No. 2010 in Port Alexander for the purpose of purchasing the lots and building the marijuana grow facility on this property. TENNEY additionally made some form of capital contribution into the grow operation, reported by JAKE to CREED to be $20,000.

COMPLAINT

*ERICKSON, ET AL V. PFIESTER, ET AL*
CASE NO. 1SI-21-_____CI
Page 6 of 25

Exhibit _____

Case 1:21-cv-00009-JMK　Document 1-1　Filed 05/03/21　Page 6 of 25

21. Around this time, JAKE approached Dave and Cory Gifford, longtime residents of PA, with a similar offering made to other PA locals. Ultimately, they bartered a trade of services where Dave and Cory would clear Lot 12 and 13 and install a foundation of pilings for the grow facility warehouse. In reliance on these promises, the Gifford's performed their end of the bargain, and JAKE agreed the Gifford's combined labor/sweat equity amounted to $50,000 in work and orally agreed to pay the Giffords 2% interest each month for their $50,000 contribution in sweat equity. JAKE recorded this amount, as disclosed to CREED, along with other loans he would go on to solicit, on the financial records of the marijuana business he maintained.

22. JAKE's process was similar for all individuals involved. JAKE approached individuals within Port Alexander, and a few others within southeast to south-central Alaska, to solicit funds for the marijuana cultivation facility. The following list of individuals received a similar pitch and offering from JAKE who promised to repay their loans in two years if they wanted out at that time. JAKE provided either oral confirmation or on occasion some receipt of the acceptance of these funds. Only one solicited individual, Tom Redmond, received an actual loan document. The following list was generated by JAKE, identifying, for himself and the PA grow, those individuals who had accepted his pitch and extended to him loaned sums for an agreed high annual interest rate.

| | | | | |
|---|---|---|---|---|
| a. | Ken and Patricia "Pepper" Pfiester | $70,000.00 | @ | 3% per month |
| b. | Kevin Mulligan | $30,000.00 | @ | 2% per month |
| c. | Justin Mulligan | $10,000.00 | @ | 2% per month |
| d. | Ryan and Molly Martin | $10,000.00 | @ | 2% per month |
| e. | Cory Gifford (bartered, labor) | $25,000.00 | @ | 2% per month |
| f. | Dave Gifford (bartered, labor) | $25,000.00 | @ | 2% per month |

COMPLAINT

Exhibit _____

|   |                                                                                              |
|---|----------------------------------------------------------------------------------------------|
| g. | Deb and Dave Gifford | $10,000.00 | @ | 2% per month |
| h. | Mira Davis | $ 2,000.00 | @ | 2% per month |
| i. | Tommy Corso | $20,000.00 | @ | 2% per month |

g. Deb and Dave Gifford     $10,000.00   @   2% per month
h. Mira Davis     $ 2,000.00   @   2% per month
i. Tommy Corso     $20,000.00   @   2% per month
    (also working at reduced hourly wage for a promised 5% of net profits)

j. Bruce Tenney     $20,000.00   @   2% per month
j. Tom Redmond     $20,000.00   @   2% per month

*hereinafter referred to collectively as ("local investors")*

23. Both JAKE and PEPPER did not provide the name's of individuals from the above list on the required financial interest disclaimer required by the Alaska Alcohol and Marijuana Control Office (AMCO) when filing for a license.

24. On or about February 2, 2019, JAKE and PEPPER collaborated to form a company called ACP, LLC, of which PEPPER was the sole owner, that would serve as the legal entity for operating the marijuana grow / cultivation business the BROTHERS and CREED were working to develop. PEPPER listed the BROTHERS as "operations managers" of ACP.

25. PEPPER also agreed to sign legal documents making her responsible for actions later taken by the BROTHERS, presumably with the good faith belief that the BROTHERS would not take any actions to defraud or adversely impact her interest in the company. Thus, while PEPPER agreed to put most, if not all, of her remaining retirement into the marijuana business in PA, the BROTHERS took steps to try and limit their personal liability in these same agreements.

26. At the same time, on February 2, 2019, JOE MARKEY also formed a separate LLC called JPI, LLC, ("JPI") that JAKE said would serve as a consultant for the ACP business, but would also serve as a conduit for repaying investors.

COMPLAINT

*ERICKSON, ET AL V. PFIESTER, ET AL*
CASE NO. 1SI-21-_____CI
Page 8 of 25

Exhibit _____

Case 1:21-cv-00009-JMK   Document 1-1   Filed 05/03/21   Page 8 of 25

27.     Later, the BROTHERS met with CREED's father WALT, a well-known landowner in the PA community.

28.     In the Summer of 2019, JOAN agreed to lend money to ACP to aid in the diversification of the local economy with the hope of generating long-term local employment.

29.     From about June 10, 2019, through approximately September 2020, JOAN extended $129,333.23 in loans to the BROTHERS to cover construction and operations expenses. These funds were wired to several Jake Markey accounts via Wells Fargo, occasionally by check and in cash. It was repeatedly stated by the BROTHERS, throughout this period, that these injections of funds would only be needed until the 4th/5th harvest when the BROTHERS promised the operation would be fully self-sustaining. JOAN believed her loan of capital would be used for operating costs related solely to the PA cultivation business only when the marijuana produced fell short of covering expenses. Contrary to this idea, the BROTHERS held back product from being sold at various times and listed JPI interest payments as ACP operating expenses being charged to JOAN. Furthermore, the BROTHERS did not disclaim the source of the interest payments to local investors, instead, they promoted ACP as a successful venture with cash flow. Upon reaching the 5th harvest, the BROTHERS stated that ACP could not sustain itself as it had been set up and asked for additional large funds needed for the expansion of ACP.

*Vessel Loan Fraud*

30.     In the summer and fall of 2019, JOAN extended an additional loan, which made the total loaned at that time to be $250,000 in credit to the BROTHERS, PEPPER, and ACP. This last loan amount of approximately $116,000 was stated to be for the purchase of the Terry

COMPLAINT

Exhibit _____

Lynn, an ocean-going vessel that would aid in the transport of building supplies for the construction of the grow facility and transport needed fuel for the generator and grow nutrients for the marijuana plants. Jake intended to have a routine independent delivery of these items on a recurring basis using this boat and at the time believed it would include the distribution of ACP product.

31.     The terms of JOAN's agreement to extend credit to the BROTHERS and PEPPER and to ACP are set out in writing in the parties' VESSEL ACQUISITION AND USE CONTRACT dated June 1, 2019.

32.     Paragraph 4 of the VESSEL LOAN provides:

> 4.     Grant of Lien. ACP hereby grants to Lender a first lien security interest in the vessel. ACP authorizes the Lender to file of record such documents as may be advisable to perfect the lien on the vessel. If Brothers or any successor acquired the vessel, they shall acknowledge the existence of the lien and acknowledger that their possession and ownership is taken subject to this lien. ACP and Brothers shall execute such documents and further assurances as requested by Lender to perfect the lien and achieve the purposes set forth in the Contract.

33.     Defendants purchased the Terry Lynn ("VESSEL") using a portion of the $250,000 loan from JOAN with the express intent to use the VESSEL to transport the building materials to PA and to use the VESSEL to transport the marijuana product produced in PA to market. The BROTHERS and PEPPER and ACP all agreed to repay the loan out of profits from the marijuana business, but ultimately they agreed to personal liability to repay the loans if the business did not repay the loan or if the company defaulted in making due payments.

34.     PEPPER, on behalf of ACP, represented and warranted in the Vessel acquisition contract that she would comply with all state regulations for licensure and operations for the

Exhibit ___

marijuana business. In addition to agreeing to grant a first lien in the vessel to JOAN as collateral for her loans, PEPPER, JAKE, JOE, and ACP were required to maintain the vessel and to maintain insurance and moorage.

35. The BROTHERS also represented and warranted in the Vessel acquisition contract they too would follow all state law requirements "if they acquire the Grow Facility or operate the business".

36. The BROTHERS have been involved with organizing, building, running, and operating the marijuana business in PA and Juneau from day one, purportedly as Operations Managers to the State and AMCO but holding themselves out to PA locals as owners.

37. The BROTHERS have personally promised and obligated themselves to repay loans made at exorbitant and usurious rates to investors out of their marijuana businesses' profits.

38. In an apparent effort to defraud state regulators, the BROTHERS demanded the inclusion of language in the Vessel acquisition contract prohibiting JOAN from "having any communications with the Alcohol Marijuana Commission ("AMCO") in the State of Alaska or any other regulatory authorities related to the grow business." Because the Vessel acquisition contract establishes a profit sharing repayment plan for assets owned and operated by ACP, the terms of the agreement should have been disclosed to AMCO board members for their review in accordance with PEPPER's and ACP's standard marijuana cultivation license application.

39. PEPPER, ACP, and the BROTHERS breached their warranty in failing to disclose the extent and nature of their profit-sharing agreements to AMCO, nor the full extent of the relationships between their various entities, investors, and creditors.

COMPLAINT

Exhibit

40.     PEPPER, ACP, and the BROTHERS had no intention of following and meeting their state law obligations and therefore breached the covenant of good faith and fair dealing incorporated into the Vessel acquisition contract.

41.     The day after signing the Vessel Loan, the BROTHERS approached 25-year-old CREED for the purpose of limiting their liability.  They convinced CREED to sign an undated document they called SIDE AGREEMENT TO VESSEL LOAN CONTRACT ("Side Agreement").

42.     Notably, JOAN, PEPPER, and ACP were not parties to this so-called Side Agreement.

43.     The Side Agreement appears to try and limit the Brothers' liability. But only CREED signed the document which provides: "ACP and Brothers would have full liability for all amounts due to Lender under the Contract, the parties agree that if ACP should be unsuccessful or disband, ACP or the Brothers will not be held liable for any outstanding payments to Lender."

44.     JOAN is not bound by the Side Agreement.  Nor do the BROTHERS have the ability to limit the liability of ACP, which is solely owned by PEPPER.  In 2020 when JOAN and WALT communicated to JAKE that JAKE and ACP had defrauded them, that the loan agreement was in default, and demanded immediate repayment of their loans, JAKE threatened to shut the business down and claim no liability due to the Side Agreement.

45.     On or about October 13, 2019, CREED and the BROTHERS entered into a Property Lease Agreement that clarified the nature of the relationship between CREED and the BROTHERS.  The Lease Agreement acknowledged that CREED contributed $5,000 to the

Exhibit _____

business as a buildout "allowance". It further provided that in exchange for use of real estate belonging to CREED's family, the BROTHERS and PEPPER and ACP agreed to pay monthly rent with "15% of all Net Profits generated related to the growing and sale of marijuana at the Grow Facility" in PA. No payments under this arrangement were ever made despite the use of leased Coram family property during construction and start-up of the marijuana business. Around this time, JAKE also used 1290 gallons of diesel from the Coram property that has never been paid for. The Lease agreement granted CREED regular access to the marijuana business's books and records to account for ACP's net profits. The agreement also engaged CREED for bookkeeping as an independent contractor at market rates.

46. Before execution of this Property Lease Agreement, redefining CREED's role with ACP and the marijuana business, JAKE represented to CREED that they would work in partnership with an agreement and understanding that CREED was entitled to 25% of the net profits of the marijuana business for a specific set of duties.

47. Relying on these promises and agreements, CREED contributed approximately 3050 hours of labor outside the scope of the Lease Agreement, working to help start up the marijuana grow business in Port Alexander. At $23 per hour, this amounts to $70,150.00 in labor that CREED has not been paid or compensated for. CREED worked in various capacities helping build the warehouse facility, doing licensing paperwork, logo design, packaging,

COMPLAINT

*ERICKSON, ET AL V. PFIESTER, ET AL*
CASE NO. 1SI-21-_____ CI
Page 13 of 25

Exhibit

Case 1:21-cv-00009-JMK   Document 1-1   Filed 05/03/21   Page 13 of 25

METRC [1] training, METRC compliance, and usage/paperwork, employee training, plant maintenance, and trimming of product. CREED was given access to the METRC reporting system, which complied with ACP's, PEPPER's, and the BROTHER's obligation to provide current reporting to CREED and JOAN. CREED performed this work between May of 2019 and October of 2020.

48.     Sometime in June or July of 2020, the BROTHERS approached CREED and WALT for the purpose of financing the purchase of a pre-roll machine and a variety of other supplies and equipment for use in the Port Alexander grow facility. The Preroll equipment is used to process marijuana trimmings into joints. These machines greatly speed up this process and increase productivity and profitability. In rough terms, a preroll machine can double the value of a pound of trim from $1,000 to $2,000 at current wholesale prices in Alaska. It was agreed that this equipment would be placed in Port Alexander strengthening the PA grow, stabilizing monthly expenses, and creating more demand for local employment.

49.     In August of 2020, JAKE sent a picture of the preroll machine to both CREED and WALT confirming the arrival of the preroll machine. JAKE had it delivered to the ALASKAN COFFEE POT retail store in Juneau that JOE owns. The BROTHERS maintained that it would be shipped down to PA when the Terry Lynn or another barge next stopped in Juneau. There were multiple opportunities to transport the equipment since it arrived in Juneau.

---

[1] METRC is an acronymn that stands for Marijuana Enforcement Tracking Reporting & Compliance (METRC) inventory tracking system, utilized by the State of Alaska's Marijuana Control Board to ensure marijuana and its products can be tracked in the regulated market.

COMPLAINT

*ERICKSON, ET AL V. PFIESTER, ET AL*
CASE NO. 1SI-21-_____CI
Page 14 of 25

Exhibit _____ 1



One step closer to making prerolls

50. The preroll machine has not yet arrived in Port Alexander, where WALT and CREED were told it would be used for the business they had invested in. The preroll machine is now being used to enhance the profits of the BROTHERS' businesses outside of PA, contrary to the representations and promises made to obtain the purchase money for the equipment.

51. During the Fall of 2019 and 2020, JAKE made many other requests to WALT and JOAN to pay additional expenses being incurred to operate the facility. They agreed and JOAN offered these loans to help grow the facility as long as JAKE would make advances of 50% of the total amounts needed. JAKE started providing WALT and JOAN a list of costs that needed to be covered, and JOAN would then advance additional sums to JAKE for 50% of the amounts shown via text or email provided by JAKE. Upon examination, those lists of expenses included the 2% per month returns to the PA locals. Also, upon checking later, WALT and CREED discovered that some of the amounts listed were inflated by 200%, based upon

information provided by a vendor who was supplying fuel. CREED also found charges listed by JAKE for personal fuel he and his family used in their residence.

52.    In October of 2020, CREED left PA to visit his family in Texas.    The BROTHERS were aware of and consented to the trip.  CREED planned on doing some limited work from Texas as he had remote access to the marijuana business's METRC system.

53.    On or about November 9, 2020, CREED attempted to login to METRC and could no longer do so.  This was a red flag for CREED and WALT and they began to try and track down JAKE and the VESSEL.

54.    In early November 2020, CREED and WALT discovered the BROTHERS and/or PEPPER and/or ACP, sold the VESSEL to a third party without prior notice to JOAN or the Coram family. CREED spoke with Port authorities in both Juneau and Hoonah to learn the owner of record and was told the vessel had been sold to LARRY CHEDERWICZ; the Hoonah Harbor Master provided  LARRY's cell phone number and also communicated that LARRY pays for monthly moorage for the vessel in the Port of Hoonah.  On January 4th, 2021 WALT spoke with LARRY over the phone. LARRY confirmed that he had purchased the Terry Lynn. He agreed to send a copy of his bill of sale but has not at this time. Claimants have no information on whether LARRY had knowledge of the lien granted by ACP to JOAN, and the lien was not recorded. By his failure to provide information, Claimants seek discovery to know if LARRY has a relationship with JAKE and/or JOE or knowledge of who owned the Terry Lynn and its granted lien to determine if he was a good faith purchaser without knowledge of the lien granted to JOAN. Since the conversation between WALT and LARRY, JAKE, on multiple occasions, has vehemently denied selling the vessel.

56.     The BROTHERS and/or PEPPER, and/or ACP, and/or JPI took possession of the sale proceeds and have refused to repay the loan in full upon demand by JOAN.

57.     To date, the total sum of funding advanced by CREED, WALT, and JOAN to DEFENDANTS is ~$413,333.000. This does not include CREED's labor and work which falls outside of the Lease Agreement and has yet to be compensated.

58. After WALT and JOAN, through their attorneys, gave notices of default under JOAN's loan agreement, demanded recission of their investment in the promissory note (a security), demanded repayment of the Tom Redmond note that was in default, and demanded repayment in full of all amounts due, JAKE refused payment and PEPPER refused to discuss the matter. Moreover, WALT contacted BRUCE TENNEY, hoping to get his cooperation in a proposed settlement agreement, and was told that he would not get involved. Attorneys for WALT and JOAN later discovered that after the demand for payment was made, JAKE transferred title to the properties that were sold by BRUCE TENNEY back to BRUCE TENNEY under some undisclosed arrangement by which the grow facility continues to operate on the property in a manner to defeat any effort by WALT or JOAN to recover their loans.

58.     The BROTHERS now appear to be withdrawing all efforts to operate ACP and the grow facility in Port Alexander profitably but instead are using that inventory in favor of what they now view as their separate holdings in Juneau, known as the ALASKAN COFFEE POT, LLC, a retail dispensary, solely owned by JOE and ACP II, LLC, a large marijuana cultivation facility in the process of getting licensed and owned by JAKE, JOE, and two Juneau individuals.

Exhibit ___

## CAUSE OF ACTION I
## SECURITIES ACT VIOLATIONS / LOAN RESCISSION
### AS 45.56.710 et seq.

59.     The VESSEL LOAN qualifies as a "security" as under the Alaska Securities Act, A.S. § 45.56.900(32).

60.     Defendants are liable to JOAN and CREED, *inter alia*, for selling this security in violation of AS 45.56.100 et seq.

61.     Defendants made untrue statements of material fact in the VESSEL LOAN and concerning the loan to Tom Redmond that CREED is now the assignee/holder of.

62.     Defendants made omissions of material fact in and at the time of entering the VESSEL LOAN and the loan to Tom Redmond.

63.     The Defendants had no intention of complying with "all state law" or satisfying all regulations to grow marijuana.

64.     The Defendants knew they had agreed to share profits from its marijuana business with JOAN, CREED, and others in its various securities offerings, and also knew they had to report such agreements and relationships to the Alaska Marijuana Control Board (AMCO).

65.     Rather than disclose these relations accurately, the Defendants insisted on language prohibiting interference from JOAN, CREED, and those they promised to share profits with and expressly directed and prohibited JOAN, CREED and others from "having any communications with the Alcohol and Marijuana Commission ("AMCO") in the State of Alaska or any other regulatory authorities related to the grow business."

66. Defendants JAKE, JOE, ACP, and PEPPER further originally omitted the material fact they intended to use the loans obtained from JOAN and WALT to pay JAKE's initial investors. Those Defendants also failed to disclose that JAKE and JOE would start an independent grow operation in Juneau that would take their time, energy, and experience away from ACP, effectively negatively impacting ACP profits which could have been used to pay off the loans to JOAN and WALT.

67. Defendants further conspired with BRUCE TENNEY. Within January 2021, JAKE has acted to retract the ACP real estate lot purchase from TENNEY. Thus, defrauding investors whose funds were used to presumably make lot payments, but assuredly were used in the cost of improvements on this property. TENNEY was also a PA loan investor, thus is in a compromised position in inspiring an additional act of fraud in an attempt to secure privately an ACP asset.

68. Defendants further conspired and acted with deceit, malice, fraudulent, and criminal intent to sell and then convert sales proceeds from the sale of the Terry Lynn vessel they had agreed would serve as collateral for JOAN's loan, and by failing to notify JOAN of the intent to sell, and in their failure to notify the third party purchaser of JOAN's lien and security interest in and to the Terry Lynn vessel prior to selling the vessel to the third party.

68. Defendants materially misrepresented their intent to use the vessel for the PA grow operation and to notify third party purchasers of the lien and security interest held by JOAN in the vessel.

69. Defendants materially misrepresented to Tom Redmond they would use the loan proceeds for the marijuana cultivation business in PA called ACP when in truth and fact, they

Exhibit _____

used proceeds from Tom Redmond's loan and other loans obtained from locals in PA to fund JPI, LLC and other entities belonging to the BROTHERS or the BROTHERS personally.

70.     Defendants have also defaulted on their payment terms under the Tom Redmond note. This note, which was solicited by JAKE, funds received by JAKE, but then ultimately signed by JOE as CEO of JPI, LLC. JPI, LLC has no ownership in ACP and is thought to have redirected funds to the MARKEY's Juneau retail space, the ALASKAN COFFEE POT.

69.     JOAN served written notice of her intent to rescind her loan and demanded reimbursement of the principal debt loaned to DEFENDANTS on December 3, 2020, pursuant to AS § 45.56.720. DEFENDANTS appear to have dodged service of that letter. JOAN again served written notice of her intent to rescind her loan and demanded reimbursement on January 7, 2021, and courtesy copied PEPPER and JAKE at their email addresses.

70.     More than 30 days have passed since JOAN served notice upon DEFENDANTS and they have not repaid the loan in full as demanded triggering the statutory remedy of rescission and reimbursement of the loan/purchase price for the security plus 8 % interest per annum from the date of the purchase.

**CAUSE OF ACTION II**
**VEIL PIERCING CLAIM**

71.     PLAINTIFFS incorporate all of the factual allegations raised in the above paragraphs in this count which applies to all causes of action raised in this complaint.

72.     There is such a unity of interest and ownership between the DEFENDANTS and JPI, LLC that their separate personalities no longer exist.

73.     The failure to disregard the corporate entity of JPI, LLC and ACP, LLC, as well as the later created ALASKAN COFFEE POT, LLC and ACP II, LLC, to the extent these entities have been used to facilitate the deceit, fraud, and harms alleged in this complaint, would sanction a fraud or promote injustice.

74.     Defendants and ACP, LLC and JPI, LLC were engaged in the following activities rendering the alter ego doctrine applicable:

       a. failure to adequately capitalize ACP and JPI;

       b.  treatment of ACP and JPI assets as their own;

       c.  commingling of funds and other assets and the unauthorized diversion of ACP and JPI funds or assets for other than ACP's or JPI's uses to the detriment of creditors;

       d.  failure to maintain minutes or adequate records;

       e.  disregard of legal formalities;

       f.  representations that JAKE and JOE and PEPPER are personally liable for ACP and JPI debts; and

       g.  use of ACP and JPI as a mere shell, instrumentality, or conduit for a single venture.

       h.  the fraudulent movement of ACP assets and PA Local's funds and the Coram's funds (e.g., taking the pre-roll equipment) without respecting the corporate entities or fiduciary duties to the corporations.

COMPLAINT

75. For these reasons, any judgment that enters against DEFENDANTS should enter jointly and severally against each and every Defendant, individually, to include BRUCE TENNEY on real estate transactions, and enter as a charging order against the individual members' interests in both JPI, LLC and ACP, LLC pursuant to AS § 10.50.380.

76. If LARRY CHEDEREWICZ, on the purchase of the Terry Lynn, if found not to be a good faith purchaser without knowledge of the lien granted to JOAN, he should be required to pay to JOAN the amount that he had paid to JAKE, who would then have been taking those funds fraudulently.

## CAUSE OF ACTION III
## BREACH OF COVENANT OF GOOD FAITH & FAIR DEALING

76. Plaintiffs incorporate by reference all other allegations for this count.

77. Defendants breached the covenant of good faith and fair dealing contained within the various agreements they entered into between themselves and Plaintiffs.

78. Defendants acted in a manner that a reasonable person would regard as "unfair" or in "bad faith" in their contractual dealings with JOAN, CREED, WALT, and the loan documents of Tom Redmond, *inter alia*.

## CAUSE OF ACTION IV
## INTENTIONAL MISREPRESENTATION

79. Defendants, individually, and/or through their respective agent(s), member(s), or manager(s) made a false or misleading statement to JOAN and PLAINTIFFS that they would not sell the Vessel and if they did they would make sure to tell the purchaser of their lien on the vessel and repay the loan out of the proceeds;

80.     The Plaintiff justifiably relied on these statements;

81.     The Plaintiff suffered a monetary loss; and

82.     The Plaintiff's reliance on the statement was a substantial factor in causing the plaintiff's loss.

**CAUSE OF ACTION V**
**PROMISSORY ESTOPPEL / UNJUST ENRICHMENT**

83.     Plaintiff incorporates by reference all of the above facts and allegations concerning this cause of action.

84.     Defendants granted a security interest and lien securing the $250,000 loan JOAN gave to Defendants.

85.     Defendants promised and agreed to notify any buyers of the Vessel of JOAN's lien rights.

86.     Relying on Defendants' promises and agreements, JOAN loaned $250,000 of her money to Defendants for the stated purpose of purchasing the Vessel, constituting complete performance.

87.     Defendants received and accepted the $250,000 loan proceeds and deposited them into Defendants' bank account(s).

88.     Defendants breached the security agreement by selling the collateral with the intent to permanently deprive JOAN of her lien rights and security interest in the VESSEL and without providing notice to the buyer of the Vessel as agreed.

COMPLAINT                                    *ERICKSON, ET AL V. PFIESTER, ET AL*
                                             CASE NO. 1SI-21-_____ CI
                                             Page 23 of 25

89.     Defendants then converted the sales proceeds to their personal use and benefit in breach of the express terms and contractual terms upon which JOAN gave the loan to Defendants.

90.     Plaintiff's reliance upon Defendants' promises was misplaced, and JOAN suffered to her detriment as a result of this misplaced reliance.

91.     Defendant's actions, omissions and deceit have caused JOAN significant financial loss, and have unjustly enriched Defendants.

**WHEREFORE**, Plaintiff prays for the following relief:

A.     An order rescinding the Vessel Loan, and ordering immediate reimbursement of all loan funds advanced to Defendants under the terms of the Vessel Loan, in an amount to be proven at trial, plus 8 % interest from the date the loan proceeds were disbursed to Defendants, and all legal fees incurred by Claimants to pursue this recovery,  pursuant to the Alaska Securities Act;

B.     Issue a charging order in the full amount of the money judgment against each individual defendants' membership interest in JPI and ACP pursuant to AS § 10.50.380.

C.     Award tort damages for intentional misrepresentation in conjunction with a punitive damages award in an amount to be proven at trial, pursuant to AS § 09.17.020, Haskins v. Sheldon, 558 P.2d 487, 492-3 (Alaska 1976) and Lockhart v. Draper, 209, P.3d 1025, 1028 (Alaska 2009) but, in any event, in an amount sufficient to deter this kind of conduct both specifically and generally.

1     D.    In the alternative, grant equitable relief for unjust enrichment or in order to estop

2   Defendants from continuing their Ponzi scheme and graft of loan proceeds.

3

4     E.    An award of attorney fees and costs pursuant to Civil Rule 82(b)(3) for

5   Defendants' bad faith and vexatious conduct.

6     F.    Any other relief the court deems necessary and just.

7

8   DATED at Wasilla, Alaska, this 12th day of February, 2021.

9                                   THE LAW OFFICE OF GREGORY S. PARVIN

10

11                                   s/Gregory S. Parvin/
12                                   Gregory S. Parvin • ABA No. 9809044
                                     Attorney for Plaintiffs
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  COMPLAINT                                    *ERICKSON, ET AL V. PFIESTER, ET AL*
                                                     CASE NO. 1SI-21-_____CI
28                                                          Page 25 of 25

                                       Exhibit _____